Christopher Eustice
655 West Forest Dr.
Houston, TX 77079
(832)-259-1634
Chris.eustice@sbcglobal.net

```
RECEIVED

NOV - 8 2018

U.S. DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

DEPUTY CLERK
```

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

CHRISTOPHER D EUSTICE

      Plaintiff,

v.                                                              Civil Action No.

STATE OF LOUISIANA THROUGH THE BOARD OF
SUPERVISORS OF LOUISIANA STATE
UNIVERSITY AND AGRICULTURAL AND
MECHANICAL COLLEGE; MEGAN C MARTTER;
AND RYAN BARSA

      Defendants.

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND:**

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES CHRISTOPHER D EUSTICE, Plaintiff Pro Se, (hereinafter referred to as "Plaintiff") complaining of the STATE OF LOUISIANA THROUGH THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE; MEGAN C MARTTER; AND RYAN BARSA, (hereinafter collectively referred to as "Defendants") and files this his Original Complaint and Jury Demand and would respectfully show as follows:

## I. JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 1983; 28 U.S.C. § 1343(a)(1),(2),(3)and(4); 28 U.S.C. § 1331; 28 U.S.C. § 1332; 28 U.S.C. § 1367; 29 U.S.C. § 794 and 42 U.S.C. §§ 12131-12150.

## II. VENUE

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to this case and the damages sustained by Plaintiff occurred in East Baton Rouge Parish, Louisiana, which is part of the United States District Court for the Middle District of Louisiana.

## III. PARTIES

3. At all times relevant to this action, Christopher Eustice, Plaintiff herein, was a student at Louisiana State University in Baton Rouge, LA. His permanent home address is 655 West Forest Dr., Houston, TX 77079.

4. Defendant Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board," "Defendant Board" or "LSU") is a public constitutional corporation organized and existing under the laws of the State of Louisiana to operate, manage, and control the LSU public university system, including its campus in Baton Rouge, with its principal place of business located at 3810 West Lakeshore Drive, Baton Rouge, Louisiana 70808. LSU is a recipient of federal funds within the meaning of 20 U.S.C. § 1681(a), under the Americans with

Disabilities Act of 1990 As Amended, and under the Rehabilitation Act of 1973.

5. Defendant Megan C Martter is of full age and majority and, at all relevant times, was a citizen of the State of Nevada, and residing in East Baton Rouge Parish, Louisiana. Defendant Martter at all relevant times was a student of LSU and a member of the Society of Petroleum Engineers at LSU. Megan C Martter may be served at her home address of 3035 Rosanna St. Las Vegas, NV 89117-3141.

6. Defendant Ryan Barsa is of full age and majority and, at all relevant times, was a citizen of the State of New Jersey, and residing in East Baton Rouge Parish, Louisiana. Defendant Barsa at all relevant times was a student of LSU and a member of the Society of Petroleum Engineers at LSU. Ryan Barsa may be served at his home address of 20 Conifer Dr. Mendham, NJ 07945-3023.

7. At all times relevant herein, all LSU faculty, staff, professors, and law enforcement officials herein were acting under color of state law in the course and scope of their duties and functions as agents, servants, and employees of their employer named herein, and otherwise performed and engaged in conduct incidental to their performance of their lawful functions in the course of their duties.

8. On information and belief, Defendant, LSU's policy, practice and custom of engaging in faulty investigations, false arrests and false imprisonment has been promulgated, effectuated and/or enforced in bad faith as a matter of express policy or custom and contrary to clearly established law.

9. In defiance of the clear constitutional command, Defendants have at all times relevant herein, promulgated, implemented, enforced and/or failed to rectify a policy, practice and custom allowing officers and deputies to engage in the sort of constitutional violations averred herein without proper oversight or sufficient corrective action. This policy or custom has resulted in the violation of the most fundamental rights of the Plaintiff herein.

10. As a direct and proximate result of the acts described herein effected pursuant to this policy or custom, Plaintiff has suffered severe psychological pain and suffering, mental anguish and loss of wages.

## IV.   STATEMENT OF FACTS

11.   Plaintiff graduated as valedictorian of his high school class in 2012 and had a perfect conduct record. **(Exhibit A)** Plaintiff is an Eagle Scout. **(Exhibit B)**

12.   Plaintiff first attended Texas A&M University with a chosen major of Petroleum Engineering("PETE"), where he experienced academic success, but after facing unfair scrutiny from the administration he transferred to Louisiana State University("LSU") in January 2015. Plaintiff attended Texas A&M for nearly 3 years.

13.   Plaintiff immediately joined several Student Organizations on the LSU Campus in January 2015, including the Society of Petroleum Engineers("SPE"), American Association of Drilling Engineers("AADE") and many other student organizations.

14.   The Plaintiff held leadership positions in those organizations and worked closely with many students who appreciated his participation. For 10 months the Plaintiff worked closely with SPE President Daniel Scott Cole and SPE President Ty Nielson to help plan events.

15.   Plaintiff experienced academic success at LSU, earning exclusively A grades throughout his first two semesters at LSU. Plaintiff was in perfect standing with the University and had no problems with the Administration for 11 months following his initial enrollment at LSU. Plaintiff had great experiences with his professors.

16.   On September 25, 2015, Plaintiff's roommate Alex Cruz commits suicide. Plaintiff and his other roommates became emotionally unstable and started blaming themselves for the incident. LSU made little to no effort to provide resources to Plaintiff or his roommates.

17.   On October 2, 2015, Plaintiff's roommate Henry Belt attempts to commit suicide. Henry Belt did not attempt to harm any other individuals. Plaintiff experienced severe emotional distress and mental anguish from these incidents and was offered little to no resources or help from LSU.

18.   Through their failure to address student suicide as a serious issue, LSU has engaged in both negligent and tortious misconduct. LSU student suicide continues to remain

a serious problem to this day.

19.     On October 14, 2015, Ryan Barsa, Student President of the American Association of
        Drilling Engineers("AADE") at LSU, stole the Plaintiff's intellectual property that
        the Plaintiff had been working on since his initial enrollment at LSU. Ryan Barsa
        also began unreasonably excluding the Plaintiff from the student organization as he
        had done with several other students. A short text message argument ensued
        between Plaintiff and Barsa and the Plaintiff stated that the LSU AADE Student
        Organization was "pathetic in comparison to the Texas A&M AADE Student
        Organization." This provoked Ryan Barsa to attempt to claim harassment charges
        with the LSU Police, who refused to press charges.

20.     Ryan Barsa's actions were in contravention of the AADE Student Organization's
        Constitution, a document created by former student leaders to protect the
        organization from rogue or oppressive student leaders. This constitutes both
        negligent and tortious misconduct as well as a breach of an implied-in-fact contract.

21.     On October 29, 2015 the Plaintiff files a Federal lawsuit against Texas A&M
        University. The lawsuit contains claims under the Americans with Disabilities Act
        of 1990 As Amended("ADA"), and claims under the Rehabilitation Act of
        1973("RA"). Plaintiff has been diagnosed with Attention Deficit/Hyperactivity
        Disorder("ADHD"). Plaintiff has an excellent case against Texas A&M University
        and expects to ultimately prevail in the ongoing legal battle.

22.     On November 15, 2015, the Plaintiff attempted to have his dispute with Ryan Barsa
        brought up with the PETE Department head, Dr. Thompson. This provoked Ryan
        Barsa to turn to other means, including defaming the Plaintiff amongst his fellow
        students and the PETE faculty. On November 15, 2015 Ryan Barsa calls Will Pecue
        to have the Plaintiff's New Orleans AADE Scholarship Check placed on hold.
        Plaintiff loses his scholarship and does not receive a scholarship when he applies
        again in 2016. The PETE faculty try to distance themselves from the issue.

23.     The problems with the LSU Administration began on November 24, 2015, when
        Ryan Barsa disclosed text messages to the LSU Office of Student Advocacy and
        Accountability("SAA"). **The text messages that Ryan Barsa disclosed to SAA**

included messages that referenced the Plaintiff's recently filed lawsuit against **Texas A&M. The Director of the LSU SAA Office, Matt Gregory, was the President and 7 year member of a Texas A&M Club for student conduct administrators, the very same administrators that the Plaintiff had just filed a lawsuit against.** SAA is responsible for disciplining students who are accused of violating the LSU Code of Student Conduct. **This is when Matt Gregory's Office(SAA) began harassing the plaintiff without good cause in retaliation to his recently filed Federal Lawsuit against Texas A&M. This was both a direct and proximate cause for the harassment by LSU Officials for the exercise of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution, and without regard for Plaintiff's rights under Section 504 of the Rehabilitation Act of 1973 and the Americans With Disabilities Act.**

24.     On November 24, 2015 Plaintiff receives a charge letter from LSU SAA for "harassment and failure to comply" for his short text message argument with Barsa.

25.     On December 7, 2015 Rachel Champagne recommends that Plaintiff be found *responsible for the charge failure to comply, likely under Matt Gregory's orders.*

26.     Plaintiff explains the egregious and obvious theft of his intellectual property and his unreasonable exclusion from the AADE Student Organization, but SAA refuses to press charges against Ryan Barsa, in contravention to the LSU Code of Student Conduct, and in contravention to LSU rules, policies, procedures, and bylaws.

27.     On December 8, 2015 Plaintiff declines responsibility for the charges and requests a University Hearing Panel("UHP"). Rachel Champagne says her decision is void *until the hearing panel. This meant her no contact directive was also void.*

28.     On January 19, 2016 Plaintiff attends a University Hearing Panel("UHP" "Horribly Rigged System" "Matt Gregory's Kangaroo Court"). As part of the UHP process, **SAA recommends a finding of responsibility and openly recommends sanctions to the panel in writing and in advance of the hearing. SAA Director Matt Gregory had the power to recommend unfair and unjust sanctions against the Plaintiff in retaliation to Plaintiff's lawsuit against his good friends, and without any checks on his power.** Plaintiff later receives a hearing outcome letter.

Plaintiff is let off with a warning and a mediation session is to be completed with Ryan Barsa by February 12 2016.

29.   The LSU Petroleum Engineering Department began denying the Plaintiff appropriate accommodations in January 2016 by shorting Plaintiff on exam testing times or denying accommodations altogether on things such as in class quizzes, in contravention of LSU rules and procedures and Federal Law(ADA and RA). This constitutes both negligent and tortious misconduct as well as a breach of an implied-in-fact contract.

30.   On the evening of February 17, 2016, the Plaintiff gave a campaign speech while running for SPE Vice President. Hundreds of Petroleum Engineering Students attended this speech. In his speech, the Plaintiff described the LSU PETE Department as having become "the laughing stock for Universities who now outperform us." This quote was a play-on and somewhat harsh Satire of Donald Trump's Presidential campaign, but the words rung true to the 200+ PETE students in attendance. In order to emphasize fundraising, the Plaintiff concluded his speech by spraying money into the audience with a money gun to a popular track by rap artist Future. This was viewed as good humor and was incredibly popular amongst his fellow students.

31.   **News of Plaintiff's speech spread far and wide, and he quickly became a campus celebrity. Plaintiff had acquired Legendary Status on the LSU campus.**

32.   On Friday February 19, 2016 the Plaintiff takes his PETE 3050 Exam 1 with the rest of his classmates. Several weeks later when the Plaintiff receives the exam back, he notices a grading error and returns the exam to Dr. Thompson for a regrade. Dr. Thompson regrades the exam, scans the exam and has his assistant release the exam to the Plaintiff.

33.   **Dr. Karsten Thompson felt as if the Plaintiff's actions threatened his role as PETE Department Head. Shortly after this speech in the Spring of 2016, Dr. Thompson successfully coerced two PETE Department professors into playing along and being complacent in a cheating case which was clearly fabricated against the Plaintiff, as proven by both direct and circumstantial evidence.**

34.   **Dr. Thompson was well aware of the issue between the Plaintiff and Ryan Barsa. Dr. Thompson had previously let the Plaintiff know that he was well aware of the SAA case regarding the short text message argument in the Fall of 2015 when the Plaintiff sought Dr. Thompson's help in the matter.**

35.   **Dr. Thompson sought the help of SAA Director Matt Gregory (President and seven year member of a Texas A&M club for student conduct administrators, the very same Texas A&M administrators who the Plaintiff had filed a lawsuit against in October of 2015.)** Dr. Gregory had a new job lined up at Texas Tech as Dean of Students, and was not afraid to risk his job at LSU.

36.   On March 18, 2016 Katie Barras recommends that Plaintiff be charged for missing a meeting with Ryan Barsa that SAA cancelled despite the fact that Plaintiff followed up with SAA via email numerous times in order to make sure the meeting took place. Dr. Gregory's office recommended that Plaintiff receive punishment and be placed on probation with restriction for not attending a meeting with Ryan Barsa. This was a mediation meeting that his office had cancelled and failed to reschedule, a meeting that the Plaintiff very much wanted to attend, despite Plaintiff's every effort to reschedule the meeting and having sent numerous emails to have the meeting rescheduled. SAA ignored the Plaintiff's emails. **These were clearly Administrative actions taken in bad faith. No reasonable person exercising their discretion would have treated the Plaintiff in a similar manner.**

37.   On April 1, 2016 the Plaintiff takes PETE 3050 exam 2 at the LSU Office for Disability Services("ODS"). The Plaintiff receives 30 minutes less time on this exam than required by contract. This can be proven by ODS records and statements from classmates. Plaintiff brings up this shortage of time to course instructor Dr. Hughes, who instructs the Plaintiff to make corrections to his exam and submit it to Dr. Thompson for a regrade as an "ODS Remediation," similar to what was done in the Plaintiff's PETE fluids class in the previous Fall 2015 semester when a similar time shortage on his exam was addressed. Dr. Hughes advises the Plaintiff that only Dr. Thompson had the authority to adjust his grade. Dr. Thompson successfully coerced Dr. Hughes to play along with his fabricated cheating claims.

38.     On April 7, 2016 Plaintiff takes PETE 3036 exam 2 through ODS. A high quality overhead camera records the plaintiff taking his exam. Upon receiving his exam back, the Plaintiff notices he did not receive credit for work that he completed on the back of one of the exam pages. Plaintiff quickly brings the grading error up with Dr. Sears, the professor of the course. Dr. Thompson later coerces the professor of the course, Dr. Sears, to play along with his fabricated cheating claims.

39.     On April 8, 2016 Matt Gregory's Kangaroo Court (the Horribly Rigged System) upholds the punishment recommended by Dr. Gregory's Office for missing the mediation meeting with Ryan Barsa. The Plaintiff is placed on probation with restriction, preventing him from engaging in on-campus extracurricular activities.

40.     On April 25, 2016 Matthew Gregory sends Plaintiff a charge letter for an alleged cheating incident. Plaintiff is accused of modifying PETE 3050 Exam 1, PETE 3050 Exam 2, and PETE 3036 Exam 2 and submitting them for a regrades. The cheating case is completely fabricated. The PETE 3050 Exam 2 was submitted as an ODS remediation due to Plaintiff receiving 30 minutes less than he should have. Dr. Hughes did not have authority to adjust Plaintiff's grade and recommended that Plaintiff turn in the corrected exam to Dr. Thompson. The class was taught by both professors. Dr. Thompson is the Department head and turned Plaintiff in for cheating. Two other exams were thrown in the mix and made to appear as if they were modified. PETE 3050 Exam 1 was ultimately excluded because Plaintiff was able to prove it was not modified prior to his hearing panel.

41.     On April 27, 2016 The Dean of Students denies Plaintiff's appeal for the missed meeting case. It seems like she doesn't look into the issue and merely reinforces whatever SAA recommends. In her denial letter she offers no information specific to the case. It looks like a generic letter that she sends to all students who appeal cases to her.

42.     On May 5, 2016 Plaintiff emails ODS to request the PETE 3036 Exam 2 testing footage but his request is denied. SAA later claims to have accessed the footage, yet refused to submit it as evidence in the case file. This footage is later destroyed and covered up.

43.  Plaintiff's family was left very traumatized from these incidents and Plaintiff's mother had a heart attack in early morning of May 8, 2016. Plaintiff had kept the SAA cases to himself until sharing information with his parents approximately 1 week prior to his mother's heart attack.

44.  On May 9, 2016 Matt Gregory recommends Plaintiff be found responsible in the fabricated cheating case. He recommends that Plaintiff receive no credit for the work in question in PETE 3050 Exam 2 and no credit for the work in question in PETE 3036 Exam 2. Plaintiff requests a hearing panel.

45.  On June 9, 2016 The hearing panel upholds Matt Gregory's recommended sanctions with a minor modification, saying that Plaintiff's professors may apply a letter grade reduction at their own discretion. Sanctions are applied several months later by Dr. Thompson, but he decides to give Plaintiff grades of zero on both exams in contravention to the ruling made by the hearing panel.

46.  Plaintiff has taken numerous elective courses, numerous geology courses, numerous business courses, and numerous miscellaneous engineering courses at LSU and has never been accused of cheating in any of those classes. Plaintiff has only been accused of cheating by PETE professors.

47.  In the fabricated cheating case, Plaintiff was led to believe Dr. Sears would be in attendance but he ultimately did not attend, to Plaintiff's great detriment. Plaintiff was denied the right to submit evidence to the panel, and denied access to ODS camera testing footage that would have exonerated him. SAA employees fabricated evidence to make it appear that the backs of PETE 3036 exam 2 pages were copied prior to handing the exams back. This is clear because the blank pages inserted did not have stapled corners while the legitimate pages had stapled corners. Additionally, the original case file that was emailed to the Plaintiff did not have the blank pages that were present at the hearing. Dr. Gregory insisted in numerous recorded conversations and at the hearing that the backs of exam pages were copied, proving his ill intent. SAA covered up and destroyed the ODS camera footage that Plaintiff had requested. The PETE professors were very dishonest throughout the whole process. Dr. Thompson lied and claimed that Plaintiff had received adequate

time on his exam when he had been shorted 30 minutes and he lied, claiming that he did not ridicule Plaintiff in front of his class during lecture. Dr. Hughes lied about advising Plaintiff to submit a regrade request to Dr. Thompson as a remediation for being shorted on time. Dr. Hughes instructed Plaintiff to do this because only Dr. Thompson had the authority to adjust Plaintiff's grade on the exam. Dr. Thompson also very likely spoke with a scholarship committee and slandered Plaintiff's reputation, causing Plaintiff to lose a scholarship that had already been issued to him.

48.  On June 21, 2016 Plaintiff was charged by Matt Gregory for allegedly lying on his college application. Plaintiff had addressed his dismissal from Texas A&M on his application in accordance with the instructions provided to him by numerous faculty members before his enrollment at LSU. Plaintiff was asked why he didn't provide more information about what occurred at Texas A&M, but Plaintiff filled out the electronic application with the maximum word count allowed. After this point Plaintiff becomes aware of Dr. Gregory's background with Texas A&M by looking at his LinkedIn Profile.

49.  **On June 30, 2016 The Dean of Students denied Plaintiff's appeal of the fabricated cheating case without even reviewing it. Plaintiff receives another generic looking letter with no specific details about his case or rationale included. The denial without review is clear from the fact that she never accessed the documents that the Plaintiff sent to her via dropbox, proven by dropbox records. This violates LSU rules, policies and procedures and constitutes a breach on an implied-in-fact contract.**

50.  **Sometime in early July 2016 Matt Gregory is no longer employed at LSU.**

51.  On July 28, 2016, the university hearing panel unanimously finds Plaintiff not responsible for lying on his college application. LSU has now determined the Texas A&M dismissal to have been unjust on two separate occasions.

52.  **Dr. Gregory pushed four cases that completely lacked any merit through his rigged system, where he or his employees would recommend sanctions that were upheld or very slightly modified by his panel members, panel members**

who work for him and were socially pressured into creating similar outcomes. In Dr. Gregory's Kangaroo Court, Plaintiff's guilt was predetermined and Plaintiff was brought before a hearing panel in order to create the illusion of a fair hearing. In one case, Dr. Gregory recommended that Plaintiff receive punishment for getting into a verbal confrontation with a well-regarded Petroleum Engineering student who had stolen Plaintiff's intellectual property. In another case, Dr. Gregory recommended that Plaintiff receive punishment for not attending a meeting with Ryan Barsa that his office had cancelled and failed to reschedule, a meeting that Plaintiff very much wanted to attend, despite his every effort to have the meeting rescheduled.

53.   The PETE Department and SAA have a long history of providing specific students unbridled discretion to cause harm to Plaintiff and many others. SAA selectively charges students who they do not like in an arbitrary and capricious manner. SAA selectively refuses to charge students who have committed far more egregious acts. SAA throws the book at specific students and charges them under very vague student rules that would subject even the most well-behaved students to almost guaranteed suspension or expulsion from the University. Plaintiff appealed the missed meeting and cheating case to the LSU Dean of Students and she denied his appeals without even reviewing them, violating LSU rules and contract law. This is proven by Dropbox records indicating that she never accessed the files along with her own written statements and actions. Plaintiff also appealed to the LSU President, and he's nearly certain their office never looked into the incident.

54.   Plaintiff attempted to transfer to the University of Houston Petroleum Engineering Program during the Summer of 2016 but was unsuccessful.

55.   In the Fall of 2016 Plaintiff reaches peak physical condition. He stands at 6 feet 3 inches and weighs 215 lbs. with only 5% body fat percentage. Plaintiff meets a female student named Megan Mitchell in one of his courses. Megan shows extreme interest in the Plaintiff and frequently engages in conversation with the Plaintiff. Megan deliberately sits in front of the Plaintiff and plays with her hair while peaking

backwards at him in class. Megan is constantly staring at the Plaintiff in class. Plaintiff has strong feelings of attraction for her but later becomes aware that she has a long-distance relationship with her high school boyfriend who attends school at West Point. Nothing comes of their relationship, but the Plaintiff saves her phone number for later use.

56. On October 12, 2016 The President of LSU denies Plaintiff's appeal for the missed meeting case without review. Plaintiff appealed both the missed meeting case and fabricated cheating case. The President's Office ultimately notifies the Plaintiff and tells him that the appeal for the cheating case will receive no review in April of 2018. This goes against the email agreement/contract sent to Plaintiff that indicates that the President's Office would be reviewing the appeal.

57. In November 2016 the Plaintiff purchases a $14,000 Two-Tone Rolex Submariner and purchases a safe to keep this expensive watch locked up in his on-campus apartment. The LSU Police show up to Plaintiff's apartment and ask to look inside his safe to make sure there isn't a handgun inside. The Plaintiff allows the Police to look inside the safe and no handgun is found. Plaintiff feels mentally distressed from the encounter.

58. On December 10, 2016 Dr. Thompson again falsely accuses Plaintiff of cheating in a class but the new director of SAA uses his good judgement and throws out the case.

59. On April 1, 2017 the Plaintiff meets Megan Martter at the SPE Baseball Tailgate. Plaintiff asks Megan for her number before leaving the tailgate and they begin texting each other that day. Megan invites the Plaintiff to the Woodlands Pool and Plaintiff reluctantly attends. **(Exhibit C)**

60. On April 2, 2017 Plaintiff's Trek Marlin 7 with upgrades is stolen on the LSU Campus. The thief cut his bike lock. The Plaintiff emails the LSU Police a very detailed description of the bike, including photos and the serial number.

61. On April 6, 2017 the Plaintiff attends the SPE Social at Caliente. Upon arriving, the Plaintiff goes to buy a beer at the bar inside with Shrey Dalal and leaves his tab open. Plaintiff makes his way to the outdoor patio, where Megan Martter greets him

eagerly, in a way that showed her attraction to the Plaintiff. Plaintiff sits down at the table where food is served. During his meal two beers are brought to the Plaintiff from inside the bar. There's a shift change and a new waitress brings the last beer. When Plaintiff leaves the new Waitress becomes confused and accused the Plaintiff of walking out on his bar tab. Megan Martter quickly texts the Plaintiff and says "you're a complete ass." Plaintiff quickly responds and texts Megan in an attempt to resolve the issue of payment and to explain the situation with his open tab to her. Megan appears to show no interest in resolving the issue of payment. Megan Martter seems upset that the Plaintiff left her at Caliente and did not show her enough interest. **(Exhibit C)**

62.   Plaintiff does his best to pay his bills. He has a credit score above 800.

63.   On September 7, 2017 the Plaintiff attends an SPE meeting where Megan Martter refers to Plaintiff as a thief in front of a large crowd of his fellow students. Plaintiff believes that Megan is upset because the Plaintiff did not show enough interest in her over the past 6 months. After the meeting, the Plaintiff texts Megan and asks her if she wanted to go on a date. Megan responds and pretends not to know who the Plaintiff is. Plaintiff sarcastically responds and suggests that the two should keep their relationship "strictly physical." Plaintiff did not harass or sexually harass Megan Martter. Plaintiff later apologized for being disrespectful on several occasions. **(Exhibit C)** Megan Martter is unable to get over the incident and began excluding Plaintiff from the SPE student organization without good cause, in contravention to the LSU SPE Constitution, engaging in both tortious misconduct and a breach of an implied contract.

64.   On September 24, 2017 the Plaintiff texts Megan Mitchell at 2 AM on a Sunday morning and asks her to come over to his place to have sex with him. The texts were otherwise clean in nature. Megan later asks the Police to instruct the Plaintiff to cease contact with her. The LSU Police seem eager to press charges over this incident for some odd reason, but Megan Mitchell begs them not to. Instead of simply calling the Plaintiff, the LSU Police show up at his door and threaten him with criminal charges and arrest if he contacts Megan again. Plaintiff is embarrassed

and experiences extreme mental distress. Plaintiff ceases contact with Megan Mitchell for good.

65. On numerous occasions the Plaintiff sought the help of LSU Administrators, Faculty, and Professors for help in resolving his issues with Megan Martter and the SPE Student Organization. Each and every time his pleas for help were ignored or he was turned away.

**66.** On October 31, 2017 Plaintiff sends an email to Megan C Martter and copies 4 other SPE student leaders on the email. Plaintiff again apologizes to Megan for his disrespectful behavior. Plaintiff goes out of his way to make Megan comfortable, and says "I want to keep our relationship strictly professional. You will not experience any more unwanted attention from me." Plaintiff offers to assist Megan in securing employment with his network of connections. Plaintiff says "All I ask from you is to be treated fairly and be allowed to attend the golf tournament as I have done so without any serious issues for the past two years." Plaintiff's email is ignored and he receives no response. **(Exhibit C.)**

67. On November 3, 2017 Rachel Champagne recommends that Plaintiff be punished for merely threatening a lawsuit against the 3 PETE professors(Thompson, Hughes, Sears) for their previous unethical and illegal actions taken against him. A confusing and obscure email from 15 months prior was introduced and used to charge the Plaintiff with "failure to comply" with a no contact directive that Plaintiff was completely unaware of.

68. On November 3, 2017 Plaintiff sends one email to Megan and 4 other SPE Officers that says they will be sued for breach of contract and blacklisted with certain employers if they do not start treating their student members fairly. Several of Plaintiff's colleagues also complained about the SPE student leaders and he learned early on that nothing was going to be done. There was also precedent from 2015 in which the PETE Department refuses to intervene in Student Organizations.

69. Dr. Thompson meets with the SPE student leaders and does not help the Plaintiff with his matter. Dr. Thompson absolutely despises the Plaintiff and probably advised Megan Martter to go file a Police Report. Dr. Thompson's actions have put

the Plaintiff through tremendous grief, caused the Plaintiff's grades to suffer immensely, and has caused the Plaintiff to be wrongfully arrested and suspended for simply threatening legal action against student leaders who were violating LSU rules, policies, and/or bylaws and wrongfully causing harm to the Plaintiff and to other students.

70.   On November 7, 2017 Plaintiff goes to SAA on for help with his SPE dispute but they turn him away, directing him to go meet with student life. Plaintiff tries to meet with student life on November 7 but they refuse to meet with him. Plaintiff sees Megan Martter leave a student life administrator's office while he is waiting in the lobby to try to speak with somebody. Plaintiff says nothing to her and does not approach her in any way. A female African American student is sitting at the reception desk.

71.   At 4:12PM on November 7, 2017, the Plaintiff emails Megan to attempt to serve her properly with a lawsuit. Plaintiff was unable to obtain her Baton Rouge address in his online search. Plaintiff notifies Megan and lets her know that he plans to serve her with process at her home address in Nevada and asks her to please provide an alternative address that would be more convenient for her. (**Exhibit C**)

72.   On November 7, 2017 Megan C Martter and Drumil Parekh go to the LSU Police and attempt to claim cyberstalking charges against the Plaintiff. It is possible that this was out of fear for their financial wellbeing. Plaintiff never made any threats of physical harm or violence. Plaintiff never made any threats of committing criminal acts. Plaintiff believes he went out of his way to make others comfortable during this difficult situation. Neither individual ever asked the Plaintiff to cease contact with them. Megan Martter provides a written statement to the Police in which she falsely claims that the Plaintiff was harassing her in person and asked to cease contact with her in person. Megan is unable to provide any credible witnesses to her claims. Her only named witness is Abdul Homran, who was also one of the abusive student leaders expecting pending litigation from the Plaintiff.

73.   LSU Officer Palermo calls Plaintiff on the evening of November 9 and instructs him to cease contact with Megan Martter and Drumil Parekh. Plaintiff complies. This act

of going to the police and claiming cyberstalking charges appears to be the new form of "Swatting" individuals who are disliked.

74.  Officer Palermo decides to only charge the Plaintiff for the messages sent to Megan Martter. Plaintiff is not charged for the texts and emails that he sent to Drumil Parekh. The only different variable in the texts and emails sent to the two individuals is the fact that the Plaintiff had asked Megan Martter to have sex with him. The manner in which the Plaintiff asked Megan Martter for sex was completely noncriminal in nature. This side by side analysis of both individuals going to the Police with nearly identical messages proves a clear cut case of a systemic problem of anti-male gender discrimination by the LSU Police and the LSU Administration, in direct violation of Title IX of the Education Amendments Act of 1972. LSU President King Alexander frequently sends out mass emails to students expressing how important women are to him, including his daughters, which is great, but has never sent similar emails expressing his support for male students.

75.  On November 8, 2017 LSU Police Officer Andrew Palermo drafts a sworn affidavit in which he intentionally withholds facts, distorts the facts of the situation and intentionally provides false and/or misleading information. This is a clear cut case of false arrest with intentional and tortious Police misconduct exceeding the preponderance of the evidence standard. Officer Palermo exaggerates the quantity of messages sent, claims Megan didn't respond in cases when she did respond, falsely claims that the Plaintiff refused to meet with him, and **falsely paints the Plaintiff as a serial sex Predator. A Sworn Affidavit said "the messages sent by Eustice included asking the victim if they could keep their relationship strictly physical, attempting to bribe the victim into letting him find her an internship or job and threatening to "blacklist" her and civilly use her." Palermo intentionally makes no mention of the nature of the dispute, misconstrues why help with finding employment was offered, and is clearly trying to imply that the Plaintiff is attempting to extort sex when that clearly wasn't the case. He writes "blacklist" as if it was some sort of hitlist when the emails sent by the Plaintiff clearly indicates that this was a blacklist with employers and a result of the Plaintiff's unreasonable treatment as a member of the SPE Student Organization. Officer**

Palermo had all of the texts and all of the emails when he was drafting the affidavit. (Exhibit C) At the end of the Sworn Affidavit, Officer Palermo lists 3 other cyberstalking cases that were not even cases of cyberstalking, were never charged as cases of cyberstalking, and again strongly implied that the Plaintiff was trying to extort sex from others. This was no accident. These were administrative actions taken in bad faith. No reasonable person exercising their discretion would have acted in a similar manner. No reasonable person would have arrested the Plaintiff.

76.    On November 9, 2017 Plaintiff is falsely arrested by the LSU Police and charged with the crime of Cyberstalking Complainant Megan C Martter. Plaintiff is held in East Baton Rouge Parish Prison for nearly 24 hours. Plaintiff's messages were neither criminal in content or in quantity, and occurred over a span of more than 7 months. (Exhibit C)

77.    The LSU Police had previously harassed the Plaintiff in September 2017 by showing up to his apartment and threatening him with criminal charges for simply ""drunk texting"" another female student ONE TIME at 2 AM on a Sunday to come over and have sex. There was no harassment on Plaintiff's part and he ceased contact with the student. The LSU Police also showed up to Plaintiff's apartment twice to harass Plaintiff about a small safe that he kept in his campus apartment because they wanted to know whether a handgun was inside. This was a false pretext for the intentional harassment of the Plaintiff by the LSU Police and the LSU Administration. There were never any witness statements that would point to the possibility of the presence of a handgun. Plaintiff let the Police look in the safe the first time and there was no handgun. Plaintiff wasn't at his apartment the second time. When the Police showed up the second time, it was after his false arrest, and Plaintiff became really scared and paranoid because he was initially unaware of the nature of their visit, and was afraid that he was going to be falsely arrested a second time. The LSU Police had a Plainclothes Officer spy on the Plaintiff in one of his classes and had an undercover officer call Plaintiff's business phone number and ask if they could visit a "local Baton Rouge store." There exists an overwhelming

pattern of nearly a dozen instances of harassment by the LSU Police against the Plaintiff with absolutely no probable cause or criminal acts of the Plaintiff being discovered in the process. Plaintiff had absolutely no criminal record for the Police to be concerned about, and Plaintiff had never had any serious problems with the Police before his false arrest. As a result of the illegal harassment by the LSU Police, the Plaintiff no longer feels safe around Police, especially LSU Police Officers. Generally, citizens can successfully sue the Police for infliction of emotional distress when an officer intentionally or recklessly acts in a way that causes emotional injury or causes emotional distress through a negligent act.

78.   A News article goes online the morning of Friday November 10 while Plaintiff is in prison and it is widely discussed at the SPE Golf Tournament. By the end of the day, nearly all of Plaintiff's colleagues are aware of the arrest. This article remains online to this day and falsely paints the Plaintiff as a sex predator. The article states "**A Sworn Affidavit said the messages sent by Eustice included asking the victim if they could keep their relationship strictly physical, attempting to bribe the victim into letting him find her an internship or job and threatening to "blacklist" her and civilly use her.**" This news article appears as the first result when Plaintiff's name is put into Google. Plaintiff continues to suffer from extreme humiliation, mental distress, and lost wages as a result of this defamatory information based on the false and misleading LSU Police affidavit.

79.   Plaintiff sends out a mass email to his fellow students on Saturday November 11 addressing the false arrest and shares the emails and texts with his fellow students. Plaintiff's colleagues frequently send out mass emails and yet Plaintiff was the only one charged under the student rules. Plaintiff was later asked to stop sending mass emails and he complied.

80.   On November 17, 2017 a hearing panel finds Plaintiff responsible for "failure to comply" due to his litigation threat and because he was presumed responsible for violations in advance of the Kangaroo Court hearing. Plaintiff is technically in good standing with the University prior to this hearing due to having no issues in the Fall

of 2016 or Spring of 2017.

81.  On November 28, 2017 Plaintiff is charged under various incredibly vague and non-specific student rules and suspended by a hearing panel on November 28, 2017. These student rules are written in a way that would allow administrators to charge and suspend any student at any time.

82.  The panel suspends Plaintiff for the Spring 2018 semester, setting him back an entire year. The 7 hours of coursework needed for his PETE degree are only offered in the Spring. The panel provides a written rationale that indicates that they were mislead by Dr. Craig Harvey into believing that the Plaintiff had violated Administrative directives. The Plaintiff had actually been fully compliant with all directives. The hearing panel asks Plaintiff zero questions during the hearing and it appears to be completely rigged. Megan C. Martter does not participate in the hearing at all.

83.  Dr. Craig Harvey, Dean of the LSU Engineering Department, has grown to hate the Plaintiff as a result of the Plaintiff filing 4 grade appeals over denied accommodations. Dr. Harvey believes that as an individual with ADHD, the Plaintiff is receiving undeserved and special treatment. Dr. Harvey put the Plaintiff on a class registration hold in the Fall of 2017 because the Plaintiff was exercising his right to file grade appeals.

84.  To add insult to injury, Dr. Harvey attended a disciplinary hearing and maliciously had the Plaintiff suspended by misleading a panel into believing that the Plaintiff was violating administrative directives and misleading the panel into believing that the Plaintiff was sexually harassing LSU students. The Plaintiff has never sexually harassed any LSU Students. Asking somebody for sex on one or two occasions is not sexual harassment. The Plaintiff was actually rather polite about it and apologized on several occasions.

85.  Dr. Harvey also falsely led the panel to believe that the Plaintiff had caused rationale students to fear for their safety on several occasions. A few students got afraid when they saw an article about the Plaintiff's arrest, as they should have been, because the article made the Plaintiff appear to be a heinous sexual predator. Dr. Harvey went further and said that the Plaintiff threatens lawsuits against people and never files

them.

86. Plaintiff is a man of his word and an Eagle Scout. He does not lie to people.

87. Plaintiff does not threaten people with lawsuits if he does not actually intend to sue them.

88. Dr. Harvey also sent the Plaintiff an email in which he claims that Plaintiff was denied scholarships due to his SAA status, and also said the Plaintiff was not his friend and was inferior to him.

89. Plaintiff's SAA status is completely illegal.

90. On November 30, 2017 the Plaintiff appeals the two SAA cases from the Fall of 2017 to the Dean of Students and she denies both appeals without even reviewing them. She denied the first appeal for the failure to comply case very quickly and went to her usual default statement that merely says "the appeal lacks preponderance," and offering no specific details or rationale to her decision-making. The Dean of Students denies the Plaintiff's appeal for the case brought against him after his false arrest by simply reiterating the written rationale of the panel who misunderstood the facts. If she had actually reviewed the case she would have realized that she also misunderstood the facts.

91. Plaintiff is mentally traumatized from the events he experienced at LSU and he performs poorly on several of his exams during November and December. Plaintiff would have earned mostly A grades but he instead received mostly B grades in his classes for the Fall 2017 Semester.

92. On December 13, 2017 the Plaintiff appeals the two Fall 2017 SAA cases to the President's Office.

93. On January 4, 2017 The Plaintiff's appeal is denied in the false arrest case and the appeal for the failure to comply case is never reviewed.

94. **During the Fall 2017 semester, Megan C. Martter abused her power as Vice President and began excluding the Plaintiff from SPE events for no reason other than the fact that he had asked her to have sex with him without first**

taking her on a date. The Plaintiff was excluded from Educational Activities for being a man. Nearly all men inherently have a sex drive and they should be allowed to sexually solicit women in a non-predatory manner, especially when those women are attracted to them. The Plaintiff's after-hours private text messages should not be subject to punishment in a student organization.

95. In his protest of this sexual discrimination and breach of LSU bylaws occurring on LSU's campus, the Plaintiff threatened to sue Megan C. Martter. The Plaintiff went to Baton Rouge City Court and picked up some small claims petitions to sue Megan C. Martter as a Pro Se Litigant. The Plaintiff went on whitepages.com to look up her address to properly serve her with court documents, and could only find her Nevada address. The Plaintiff was concerned that serving Megan at her Nevada address might be considered legally insufficient in the eyes of some Judges because she was temporarily away from home, and the Plaintiff emailed Megan to give her an opportunity to provide him with an alternative address that would be more convenient for her. This is when Megan C. Martter went to the LSU Police, in fear of her financial well being, and filled out a sexual violence form authorizing the Plaintiff's false arrest, although in her own written statements she admits that there was no sex and no violence.

96. This gave the LSU Police the green light to wrongfully and falsely arrest the Plaintiff, not bound by the laws of our Great Nation, but bound by the agenda put forth by the LSU Administrators in their crusade against men. In order to appease the Administration, the LSU Police cleverly crafted a sworn affidavit that alleges that the Plaintiff was trying to extort sex from Megan and 3 other females, when all of the evidence proves otherwise.

97. The Plaintiff was excluded from Educational Activities for being a man, and in his reasonable protest of this, he was arrested for being a man. His mugshot was posted online for the world to see and he was proclaimed to be a sexual predator.

98. This was not enough to satisfy the LSU Administrators in their manhunt. The

Administrators had the Plaintiff wrongfully suspended from LSU on November 28, 2017, setting him back an entire year.

99.     In their disgraceful actions, LSU had Christopher D Eustice excluded from University activities for being a man, arrested for being a man, defamed for being a man, and suspended from their University for being a man, all in direct violation of Title IX of the Education Amendments of 1972.

100.    In February 2018 the Plaintiff rejected an offer to have the criminal charges dropped by paying a $200 fine. The Plaintiff will keep his $200. The Plaintiff will make no deals with prosecutors. The Plaintiff expects to win at trial if there ever is a trial. The Plaintiff respectfully requests the Court to postpone any decisions on Motions to Dismiss this case until the Plaintiff is acquitted.

101.    Plaintiff enrolled at Houston Community College as a full-time student in January 2018. He is currently working on business courses and on an IT Cybersecurity degree. He has maintained a 4.0 GPA at the institution and has had no conduct issues there.

102.    On April 30, 2018 LSU Managing Attorney Trey Jones indicates that Plaintiff's appeal for the false cheating accusations will receive no review.

103.    On June 19, 2018, after complaining to LSU Police Chief Bart Thompson via email about his false arrest and other Police harassment, the LSU Police tried to bribe the Plaintiff with somebody else's bike that they stole from an evidence locker in Dallas, TX. The Plaintiff had previously emailed the LSU Police a very detailed description of the bike and serial number when it had been stolen in April 2017. A thief had cut Plaintiff's bike lock on the LSU Campus and stole his Trek Marlin 7 with upgrades, valued in excess of $1,000. The LSU Police offered the Plaintiff a Trek Wahoo. Plaintiff received photos via email from the Officer in charge of the evidence locker in Dallas, TX.

104.    Plaintiff has been vigorous and persistent in insisting that Defendants follow their own rules and the law. That persistence has caused great resentment among LSU faculty and administrators and has resulted in animosity for challenging their belief

that they have absolute power and unbridled discretion where student matters are concerned.

105. LSU, through its teaching staff and administrators, engaged in harassing and retaliatory behavior for Plaintiffs exercise of his constitutional rights to due process of law and freedom of speech, and without regard for Plaintiffs rights under Section 504 of the Rehabilitation Act of 1973 and the Americans With Disabilities Act.

106. LSU's illegal and unconstitutional actions, taken through its staff and administration, are systemic as a result of policies and practices developed both in its policy and rulemaking process and through an autocratic attitude developed over time. These failures are exemplified by the words and deeds of the faculty and administration in these disgraceful actions.

## V.    FIRST CAUSE OF ACTION

## VIOLATION OF PLAINTIFF'S DUE PROCESS RIGHTS
## UNDER THE FOURTEENTH AMENDMENT TO THE
## UNITED STATES CONSTITUTION

107. Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

108. The recitations contained in the Statement of Facts above are incorporated in this section as if repeated herein.

109. None of the LSU procedures described above meet even the most rudimentary requirements of either procedural or substantive due process of law.

110. Defendants have refused to apply their existing hearings and appeals policies and procedures in a manner comporting with their duties under the 14th Amendment to the United States Constitution.

111. Plaintiff has been deprived of an important property interest. He is left burdened with additional student loans and related costs due the costs of transferring to another university after his dismissal and other costs and expenses and the damage to his reputation.

112.   Plaintiff has been deprived of his liberty interest in his reputation.

113.   These actions were the proximate cause of Plaintiffs injuries.

## VI.   SECOND CAUSE OF ACTION - SECTION 504 OF THE REHABILITATION ACT OF 1973 AND THE AMERICANS WITH DISABILITIES ACT

114.   Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

115.   Plaintiff is a disabled individual under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and the Americans With Disabilities Act, 42 U.S.C. §§ 12131-12150, where disability is defined as a physical or mental impairment that substantially limits one or more of the major life activities of an individual, a record of such an impairment, or being regarded as having such an impairment.

116.   Plaintiff requested accommodations for testing because of his diagnosed and identified disability, Attention Deficit/Hyperactivity Disorder. These accommodations were refused.

117.   Defendants made few of the accommodations requested and required by each of these laws before acting based on behaviors directly related to and resulting from this disability, even after being made aware of Plaintiff's disability.

118.   LSU is the recipient of federal funds.

119.   These actions were the proximate cause of Plaintiffs injuries.

## VII. THIRD CAUSE OF ACTION

## DAMAGE TO REPUTATION

120.   The recitations contained in the Statement of Facts above are incorporated in this section as if repeated herein.

121.   Defendants have caused great harm to Plaintiffs reputation by their actions without good cause or due process of law. These actions were taken with a conscious indifference to Plaintiffs rights enumerated herein and are a part of a pattern and practice of disregard for students' legal and constitutional rights.

122.   Plaintiff's reputation will be forever scarred by his false arrest and by the defamatory

news article that will likely remain online forever.

123. Defendants negligently or intentionally made false statements of fact about Plaintiff to third parties.

124. Plaintiff's reputation has been damaged greatly because of the illegal and unconstitutional acts of LSU and its staff and administration and defendants.

125. These actions were the proximate cause of Plaintiff's injuries.

## VIII. FOURTH CAUSE OF ACTION

### FALSE ARREST

126. Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

127. Plaintiff has suffered damages, including, but not necessarily limited to, mental and psychological anguish.

128. Defendants, operating under the color of law, wrongfully abused the judicial process to have Plaintiff, CHRISTOPHER D EUSTICE arrested, and subsequently never tried or convicted, for the crime of Cyberstalking (La. R.S. 14:40.3).

129. Plaintiff now brings this action against Defendants pursuant to federal statute and relevant state law to redress the deprivation under color of law of Plaintiff's rights as secured by the United States and Louisiana Constitutions.

130. In the manner described above, Defendants violated Plaintiff's constitutional rights, as described earlier herein.

131. Defendants had no objective evidence to directly implicate Christopher Eustice in the alleged Cyberstalking (La. R.S. 14:40.3).

132. Defendants are being sued for the following reasons, to wit:

A. Failing to establish and/or maintain policies, procedures, training and/or supervision of staff and other employees;

B. Failing to promulgate proper policies and procedures which would assure that the employees of the LSU Police Department would adhere to proper standards; and

C. By violating policies and/or procedures and/or general orders applicable under the circumstances.

D. Failing to adhere to proper standards;

E. Failing to follow all internal procedures, safeguards and protocol required by generally accepted law enforcement procedures and/or LSUPD procedures; and

F. All of the Defendants actions were undertaken under color of law and within the scope of their employment such that the employer, LSU Police Department, is liable for their actions.

133.   STATE LAW CLAIMS: Defendants are liable to Plaintiff for their acts and omissions which caused his: A. Wrongful arrest; B. Wrongful detention; and C. Malicious prosecution.

134.   Those acts described above caused resulting injury to the Plaintiff. These include, but are *not necessarily limited to*:

a. Mental suffering and anguish;

b. Psychological suffering and anguish;

c. Emotional distress inflicted both negligently and intentionally;

d. Economic losses including having to pay Attorney's Fees for the defense of the above-mentioned charges; and

e. Lost wages.

135.   Plaintiff seeks and is entitled to attorney's fees under 42 U.S.C. 1981, 1983 and 1988.

## IX. FIFTH CAUSE OF ACTION

### Violation of Title IX, 20 U.S.C. § 1681, et seq.

136.   Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

137.   Through its policy and practice, LSU has persisted in a systematic, intentional, differential treatment of male students seeking educational opportunities and benefits

through LSU and, therefore, has discriminated against male students in violation of Title IX.

138. As a result of LSU's policy and practice of treating the male students significantly less important than female students, male students seeking to access the educational opportunities and benefits LSU provides face serious and substantial risks of false arrest and defamation as a result of systemic discrimination, while female students seeking similar educational benefits and opportunities did not face the same serious or substantial risks.

139. LSU, through its employees and administrators responsible for overseeing the LSU Police system at LSU, had the authority to directly investigate and take meaningful corrective action to end the false arrests threatening male students within the LSU campus, and to provide male students equal access to those educational benefits and opportunities without facing serious risks of false arrest, defamation, and unjust suspension. Despite this, LSU consciously, recklessly, and deliberately failed to do so.

140. As a direct and proximate result of LSU's discriminatory actions, inactions, policies and practices, and deliberate indifference, in violation of the requirements of Title IX, Christopher D Eustice was falsely arrested, defamed, and wrongfully suspended, and endured great mental pain and suffering and lost wages.

## X. SIXTH CAUSE OF ACTION

### BREACH OF CONTRACT

141. Federal Courts have Supplemental Jurisdiction and Diversity Jurisdiction over Plaintiff's State law claims. Plaintiff is a resident of Texas.

142. Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

143. Students have a right to protection from arbitrary or capricious decision making.

144. Decision making should not be arbitrary or capricious / random and, thus, interfere with fairness. While this case concerned a private school, Healy v. Larsson (1974) found that what applied to private intuitions applied also to public.

145. Students have a right to have institutions follow their own rules.

146. Institutions are required, contractually, to follow their own rules.

147. Institutional documents may also be considered binding implied-in-fact contracts. Goodman v. President and Trustees of Bowdoin College (2001) ruled that institutional

documents are still contractual regardless if they have a disclaimer.

148. Students have a right to adherence to regulations.

149. Students are protected from deviation from information advertised in regulations.

150. Students have a right to adherence to student codes.

151. Students are protected from deviation from information advertised in student codes.

152. Students have a right to adherence to handbooks.

153. Students are protected from deviation from information advertised in handbooks.

154. Students have a right to fulfillment of promises made by advisors.

155. Healy v. Larsson (1974) found that a student who completed degree requirements prescribed by an academic advisor was entitled to a degree on the basis that this was an implied contract.

156. Students have a right to a continuous contract.

157. Mississippi Medical Center v. Hughes (2000) determined that students have an implied right to a continuous contract during a period of continuous enrollment suggesting that students have the right to graduate so long as they fulfill the requirements as they were originally communicated.

158. Students have a right to fulfillment of verbal promises.

159. Verbal contracts are also binding. The North Carolina Court of Appeals in Long v. University of North Carolina at Wilmington (1995) found, however, that verbal agreements must be made in an official capacity in order to be binding (Bowden, 2007). Dezick v. Umpqua Community College (1979) found a student was compensated because classes offered orally by the dean were not provided.

## XI.   INJUNCTIVE RELIEF

160. Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

161. Plaintiff will suffer irreparable harm if the Defendants are allowed to continue their present course of action.

162. Defendant's actions described above consist of wrongful acts.

163. There exists imminent harm in the actions of Defendant described above.

164. There is no adequate remedy at law.

165. Plaintiff has exhausted all administrative remedies.

166. Plaintiff prays for this court to order reversal of the improper grades received at LSU.

### XII. DAMAGES

167. Plaintiff is entitled to damages in excess of the jurisdictional limits of this court to compensate Plaintiff for:

- Reimbursement for additional tuition, costs and fees at HCCS.
- Damages in an amount exceeding the jurisdictional limits of this court for failing to grant the accommodations requested and required by Section 504 of the Rehabilitation Act of 1973 and the Americans With Disabilities Act.
- Lifetime economic damages caused by the necessity to transfer to an institution of lesser prestige.
- Damages in an amount exceeding the jurisdiction of this court for damage to Plaintiffs reputation and lifetime economic damages resulting from his False Arrest.
- Damages for violations of Plaintiffs constitutional rights in an amount exceeding one million dollars ($1,000,000) dollars.
- Damages for violations of state and federal laws and regulations.
- Punitive damages in an amount sufficient to punish Defendants for their illegal and unconstitutional behaviors and actions and discourage them from acting in a like manner in the future.
- Attorneys' fees in an amount to be determined by the Court.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for judgment against Defendants, jointly and severally, in the manner and particulars noted above, and in an amount sufficient to fully compensate Plaintiff for the elements of damages enumerated above, judgment for damages, reversal of the improper grades received as described in this action and recovery of attorney's fees and costs for the preparation and trial of this cause of action, and for its appeal if required, together with pre- and post-judgment interest, and court costs expended herein, and for such other relief as this Court in law and in equity, deems just and proper.

Respectfully submitted,

*Chris Eustice*

Christopher D Eustice

Plaintiff Pro Se

655 West Forest Dr.

Houston, TX 77079

(832) 259 – 1634

chris.eustice@sbcglobal.net